**In The Matter Of:**

*E.M./D.H. v.*

*Tucker Inn, et al*

---

*March 3, 2023*

---

*D'Amico & Associates, Inc.*

*Court Reporters & Videoconferencing*

*5855 Sandy Springs Circle #140, Atlanta, GA 30328*

*(770) 645-6111 or toll-free (888) 355-6111*



Min-U-Script® with Word Index

E.M./D.H. v.
Tucker Inn, et al

March 3, 2023

---

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF GEORGIA
     ATLANTA DIVISION

3
     E.M.,                          )
4          Plaintiff,               )
                                    ) CIVIL ACTION
5    vs.                            )
                                    ) FILE NO. 1:22-cv-03419-JPB
6    TUCKER INN INCORPORATED        )
     d/b/a SUPER 8 BY WYNDHAM,      )
7                                   )
          Defendant.                )
8    _____)
     D.H.,                          )
9          Plaintiff,               )
                                    ) CIVIL ACTION
10   vs.                            )
                                    ) FILE NO. 1:22-cv-02559-WMR
11   TUCKER INN, INC., d/b/a        )
     AMERICA'S BEST VALUE INN,      )
12                                  )
          Defendant.                )
13   _____)

14

15         Videotaped Remote Videoconference

16   Deposition of TONYA SHERRON SMITH HARRIS, taken on

17   behalf of the Plaintiff, pursuant to the

18   stipulations contained herein, signature being

19   reserved, before Laura B. Gildenberg, Certified Court

20   Reporter and Notary Public, on the 3rd day of March 2023,

21   commencing at the hour of 5:29 p.m. EST.

22

23         D'AMICO & ASSOCIATES, INC.
           Court Reporters & Videoconferencing
24         5855 Sandy Springs Circle, Suite 140
           Atlanta, Georgia  30328
25         (770) 645-6111
           www.DamicoAssociates.com

---

**Page 2**

1    I N D E X   T O   E X A M I N A T I O N

2    Examination by Mr. Tonge . . . . . . . . . . . .   7

3    Examination by Ms. Merrill . . . . . . . . . . .  34

4    Further Examination by Mr. Tonge . . . . . . . .  47

5

6

7         I N D E X   T O   E X H I B I T S

8    Exhibit No.   Description                   Marked

9    P-1     Photographs. . . . . . . . . . . .     10

10   P-2     8/26/2014 Incident Report,
             DeKalb County Police Department. . .   13

11

12

13

14              DISCLOSURE(S)

15   Reporter Disclosure of No Contract . . . . . . . .   3

16   Firm Disclosure of No Contract . . . . . . . . . .   4

17

18

19         (The following transcript may contain
           quoted material, which is reproduced as
20         read or spoken.)

21

22

23         P U N C T U A T I O N   N O T E

24   -- = Sentence interrupted

25   ... = Sentence not completed though not interrupted

---

**Page 3**

1         REPORTER DISCLOSURE OF NO CONTRACT

2

3         I, Laura B. Gildenberg, Certified Court
4    Reporter, do hereby disclose pursuant to Article
     10.B of the Rules and Regulations of the Board of
5    Court Reporting of the Judicial Council of Georgia
     that I am a Georgia Certified Court Reporter.
6    D'Amico & Associates/I was contacted by the party
     taking the deposition to provide court reporting
7    services for this deposition; D'Amico & Associates/I
     will not be taking this deposition under any
8    contract that is prohibited by O.C.G.A. 15-14-37(a)
     and (b) or Article 7C of the Board; and I am not
9    disqualified for a relationship of interest under
     the provisions of O.C.G.A. 9-11-28(c).
10        There is no contract to provide reporting
     services between myself or any person with whom I
11   have a principal and agency relationship nor any
     attorney at law in this action, party to this
12   action, party having a financial interest in this
     action, or agent for an attorney at law in this
13   action, party to this action, or party having a
     financial interest in this action.  Any and all
14   financial arrangements beyond my/D'Amico &
     Associates' usual and customary rates have been
15   disclosed and offered to all parties.
          This, the 3rd day of March, 2023.

16

17

18

19        LAURA B. GILDENBERG, CCR B-1810

20

21

22

23

24

25

---

**Page 4**

1         FIRM DISCLOSURE OF NO CONTRACT

2

3         I, Kelly D'Amico, do hereby disclose
     pursuant to Article 10.B of the Rules and
4    Regulations of the Board of Court Reporting of the
     Judicial Council of Georgia that D'Amico &
5    Associates, Inc. was contacted by Andersen, Tate &
     Carr, P.C., to provide court reporting services for
6    this deposition and there is no contract that is
     prohibited by O.C.G.A. 15-14-37(a) and (b) or
7    Article 7C of the Rules and Regulations of the Board
     for the taking of this deposition.
8         There is no contract to provide reporting
     services between D'Amico & Associates, Inc. or any
9    person with whom D'Amico & Associates, Inc. has a
     principal and agency relationship nor any attorney
10   at law in this action, party to this action, party
     having a financial interest in this action, or agent
11   for an attorney at law in this action, party to this
     action, or party having a financial interest in this
12   action.  Any and all financial arrangements beyond
     D'Amico & Associates' usual and customary rates have
13   been disclosed and offered to all parties.
          This, the 3rd day of March, 2023.

14

15

16

17        KELLY D'AMICO, CEO
18        D'AMICO & ASSOCIATES, INC.

19

20

21

22

23

24

25

---

E.M./D.H. v.
Tucker Inn, et al

March 3, 2023

Page 5

1    REMOTE APPEARANCES OF COUNSEL:

2

3    ON BEHALF OF THE PLAINTIFFS:

4    JONATHAN S. TONGE, ATTORNEY AT LAW
     TRINITY M. HUNDREDMARK, ATTORNEY AT LAW
5    Andersen, Tate & Carr, P.C.
     One Sugarloaf Centre, Suite 4000
6    1960 Satellite Blvd.
     Duluth, Georgia 30097
7    (770) 822-0900
     Telephone: (770) 822-0900
8    E-mail:    jtonge@atclawfirm.com
     E-mail:    thundred@atclawfirm.com

9

10

11   ON BEHALF OF THE DEFENDANT:

12   MARISSA MERRILL, ATTORNEY AT LAW
     Swift, Currie, McGhee & Hiers, LLP
13   1420 Peachtree Street, N.E.
     Suite 800
14   Atlanta, Georgia 30309
     Telephone: (470) 639-4861
15   E-mail:    marissa.merrill@swiftcurrie.com

16

17

18   VIDEOGRAPHER (ALSO PRESENT REMOTELY):

19   Styles Caldwell

20

21

22                         - - -

23

24

25

Page 6

1    P R O C E E D I N G S
2    (On the video record.)
3        THE VIDEOGRAPHER: The date is March 3rd,
4    2023, and we're on the record at 5:29 p.m.
5    This will be the video deposition of
6    Tonya Harris in the matter of D.H. versus
7    Tucker Inn, Incorporated, d/b/a Super 8 by
8    Wyndham, taken remotely via Zoom
9    videoconference.
10       Would counsel please identify themself
11   for the record and state any objections to the
12   witness being sworn remotely.
13       MR. TONGE: Jonathan Tonge for the
14   plaintiffs.  No objection to the witness being
15   sworn.
16       MS. MERRILL: Marissa Merrill for the
17   defendant.  No objection for the witness being
18   sworn remotely.
19       THE VIDEOGRAPHER: And will the court
20   reporter please swear in the witness.
21       TONYA SHERRON SMITH HARRIS,
22       located in Grayson, Georgia,
23       having been first remotely sworn,
24       was examined and testified as follows:
25   (continued)

Page 7

1    EXAMINATION
2    BY MR. TONGE:
3    Q.  Okay.  Ms. Harris, we -- we have talked
4    but never met face-to-face like this.  My name is
5    Jonathan Tonge and I represent the plaintiffs in these
6    two matters.
7        MR. TONGE: So this will be the
8    deposition of you, Tonya Harris, taken for all
9    purposes under the Federal Rules of Civil
10   Procedure including use at trial.  It's taken
11   by agreement in two cases, D.H. v. Tucker Inn,
12   Incorporated, Number 1:22-cv-03419, and E.M. v.
13   Tucker Inn, Incorporated, Number 1:22-cv-02559.
14       Marissa, do you want to waive objections
15   or -- except for to the form and the
16   responsiveness?
17       MS. MERRILL: I think we need to put them
18   on the record with it being --
19       MR. TONGE: Okay.
20       MS. MERRILL: -- to be used a trial,
21   so...
22       MR. TONGE: Okay.  That's fine.
23       BY MR. TONGE:
24   Q.  Ms. Harris, can you state your full name
25   for the record.

Page 8

1    A.  Tonya Sherron Smith Harris.
2    Q.  Okay.  And have you ever given a
3    deposition before today?
4    A.  No.
5    Q.  Okay.  You understand that you're under
6    oath?
7    A.  I do.
8    Q.  And you understand that your testimony
9    will be used by the judge and jury in this case?
10   A.  Yes.
11   Q.  And will you agree to give truthful and
12   complete answers to the questions that I ask?
13   A.  Yes.
14   Q.  And are you under the influence of any
15   drugs or narcotics that would prevent you from
16   testifying truthfully?
17   A.  No.
18   Q.  Okay.  And if you don't understand a
19   question -- sometimes I can ask a bad question or --
20   or it will be confusing -- and so if you don't
21   understand what I'm asking, just ask me to repeat it
22   or rephrase it, and I -- and I'll do it again so we
23   understand each other.  Okay?
24   A.  Okay.
25   Q.  And like the court reporter was saying:

E.M./D.H. v.
Tucker Inn, et al

March 3, 2023

Page 9

1  In conversation, we have a tendency to anticipate what
2  other people are going to say and we may nod or -- or
3  answer.  But if you can, just wait until I ask --
4  finish asking my question and then you answer.  And at
5  times I may ask a question and -- and Marissa might
6  object.  And so if I ask a question, let her object
7  and then you answer.  Okay?  And we'll just try not to
8  talk over each other so that we can get a clean
9  record.  Okay?
10 A.  (Nods head affirmatively.)
11 Q.  And so instead of nodding, would you say
12  "yes"?
13 A.  Yes.
14 Q.  Okay.  Gotcha.  What is your date of
15  birth?
16 A.  ████████████████
17 Q.  Okay.  And where do you live?
18 A.  Grayson, Georgia.
19 Q.  Okay.  And -- And what -- what is your
20  address?  Just in case we need to -- to serve you with
21  anything regarding the trial.
22 A.  Okay.  ████████████████████
23 Q.  Okay.
24 A.  ████████████████████
25 Q.  Okay.  And what do you -- what do you

Page 10

1  currently -- what do you do for a living?
2  A.  I work with a medical records company.
3  Q.  Okay.  And what do you do with them?
4  A.  Medical charts.
5  Q.  Okay.  I'm going to go ahead and show you
6  what I've marked as Plaintiffs' Exhibit 1.
7    (Plaintiffs' Exhibit Number P-1 was
8    marked for identification.)
9    BY MR. TONGE:
10 Q.  And let me try to see if this
11  screen-share works.
12    Can you see that?
13 A.  (No audible response.)
14 Q.  Is that a yes?
15 A.  Yes.
16 Q.  Yes.  Thanks.  Just if we can, verbalize
17  it.  The -- She can't take down much of the head
18  nods --
19 A.  Got it.
20 Q.  Do you recognize the scene in this
21  photograph?
22 A.  I do.
23 Q.  Okay.  And what is that?
24 A.  Super 8 motel.
25 Q.  Okay.  And how do you know what that is?

Page 11

1  A.  I've stayed there.
2  Q.  Okay.  And is that a fair and accurate
3  representation of the Super 8 that was located at
4  1600 Crescent Center Boulevard in Tucker, Georgia?
5  A.  Yes.
6  Q.  Okay.  I'm going to scroll through.  I
7  have a few other pictures of it and I don't know that
8  we'll use them all, but just so you can see them.
9    And so that's Page 1.  This is Page 2.
10   Did you have a chance to see that?
11 A.  Yes, sir.  Uh-huh (affirmative), yes.
12 Q.  This is Page 3.
13   Do you see that?
14 A.  Yes.
15 Q.  Page 4.
16   Got it?
17 A.  Yes.
18 Q.  And this is Page 5, which is a zoom-out
19  of this area.
20   Can you see my little mouse hand here?
21 A.  Yes.
22 Q.  And so this is -- I'll just represent to
23  you the motel changed to a America's Best later on and
24  so that's why it says that.  But this is what the
25  Super 8 used to be is right there.  And this is just a

Page 12

1  zoom-out of that area, which shows the Knights Inn
2  over here in the top right, the Masters Inn kind of in
3  the bottom left, and the Motel 6 in the top left.
4    Do you see all of that?
5  A.  I do.
6  Q.  And do you -- do you recognize this area
7  in the photograph?
8  A.  I do.
9  Q.  Okay.  And is this a fair and accurate
10  representation of that area?
11 A.  Yes.
12 Q.  Okay.  And were all the pages of the
13  exhibit, with the -- the different views of the motel,
14  do you recognize all these as the Super 8 on Crescent
15  Center Boulevard?
16 A.  Did you hear me?
17 Q.  Oh, I did not hear you.  I'm sorry.
18 A.  I said, yes.
19 Q.  Okay.  And are all of those a -- a fair
20  and accurate representation of the motel?
21 A.  Yes, sir.
22 Q.  Okay.  And if I say "motel" or "hotel" or
23  "Super 8," I'm -- I'm referring to the Super 8 that
24  we're looking at on Crescent Center Boulevard.  Okay?
25 A.  Okay.

Page 13

1 Q.  When did you first stay at the Super 8
2 motel?
3 A.  I don't remember.  It's been some years
4 ago, maybe six to eight years ago.
5 Q.  Okay.  Do you remember a year at all?
6 A.  No.  Between 2014 and maybe 2016.
7 Q.  Okay.  I'll go ahead and show you
8 Exhibit 2.
9      (Plaintiffs' Exhibit Number P-2 was
10 marked for identification.)
11      BY MR. TONGE:
12 Q.  Let me share a different screen.
13      Can you see that?
14      MR. TONGE: Well, I don't see -- What am
15 I screen-sharing here?  Am I sharing my clients
16 here?
17      MS. MERRILL: No.  You were showing the
18 incident report.
19      MR. TONGE: Oh, okay.  I thought so.  It
20 didn't look the same.
21      BY MR. TONGE:
22 Q.  Okay.  Y'all see the incident report
23 going up and down?
24 A.  Uh-huh (affirmative), yes.
25 Q.  Okay.  And you see where it says, DeKalb

Page 14

1 County Police Department, at the top?
2 A.  I do.
3 Q.  Okay.  I'll kind of walk you through what
4 this says just for the record.
5      So here at the top left, the Incident
6 Type is runaway juvenile located.  Do you see that?
7 A.  Barely, but yes.
8 Q.  Okay.  I'm going to zoom in a little bit.
9      Does that help?
10 A.  Yes.
11 Q.  Well, that's too much there.
12      Okay.  So right here -- And the date of
13 the report is August 26th, 2014.  Do you see that?
14 A.  Yes.
15 Q.  Okay.  And have you ever seen this report
16 before?
17 A.  Honestly, I don't remember that, no.
18 Q.  Okay.
19 A.  I don't remember anything like this, no.
20 Q.  Okay.  I'm going to scroll down to Page 3
21 of this report, and there's a narrative that the
22 officer wrote in.
23      Can you read that?  Or can you see that?
24 A.  Yes, fairly good.
25 Q.  And try to review that.  I -- I don't

Page 15

1 know if I can zoom in much more without losing it.
2      But the first line says:  On the listed
3 date and time -- so August of 2014 -- the officer
4 responded to the Super 8 hotel at Crescent Center
5 Boulevard.  A woman had called believing her
6 16-year-old son had ran away and had gone to Room 10
7 [sic].
8      And then the officer says:  Upon my
9 arrival, I made contact with the juvenile, listed
10 suspect, and a Ms. Tonya S. Harris, who had rented the
11 room.  According to Ms. Harris, the juvenile and his
12 parents were brief friends of hers when they all
13 stayed over at the Motel 6 located at 2810
14 Lawrenceville Highway.  She went on to advise that she
15 and her children left that location several days ago
16 and got a room at their current location.
17      She further stated that around the same
18 time, the juvenile and his mother had been kicked out
19 of the Motel 6 and had moved to an unknown location
20 somewhere in the city of Atlanta.  When asked how the
21 juvenile had ended up in her room, she advised that he
22 had shown up on 8/24/2014 and asked if he could stay
23 there because he and his mom had gotten in a fight.
24      Does that refresh your recollection at
25 all?  Do you remember anything about this?

Page 16

1 A.  I do remember the young man.  But the
2 exact date and time, no.  But --
3 Q.  Okay.
4 A.  -- I do remember him.
5 Q.  Does that sound right, that you would
6 have been at the Super 8 on or around August 26th,
7 2014?
8 A.  Yes.
9 Q.  Okay.  And then I think if you go down
10 here -- I'll go back to the narrative.  Let's see.
11      Yeah.  In here it says that she -- which
12 is Tonya Harris, you -- went on to advise that she and
13 her children left that location several days ago and
14 got a room at the current location.
15      So do you think it -- does it sound
16 correct that you had -- had recently come to the
17 Super 8 motel, you know, days or a week or so before
18 this incident report?
19 A.  Yes.
20 Q.  Okay.  So I'm going to switch back to the
21 other screen.
22      Do you know roughly how long you stayed
23 at the Super 8 after that?
24 A.  No.  I don't remember; it's been so long.
25 Q.  Okay.  I'm going to get to this other

E.M./D.H. v.
Tucker Inn, et al

March 3, 2023

Page 17

1  screen. I'm just going to leave this up.
2    So why were you staying there? Do you
3  recall?
4  A. I was homeless.
5  Q. Okay. And who was staying with you at
6  the motel?
7  A. Myself and my two children.
8  Q. Okay. How old were your children at the
9  time, about?
10 A. Let's see. 2014? Alexander is 18, so...
11 Q. So about 11-ish?
12 A. Yeah.
13 Q. Okay.
14 A. And Ashya's four years older than him.
15 Q. Okay. So about 15?
16 A. Yes.
17 Q. Okay. Can you tell me generally about
18 the motel and what it was like staying there?
19 A. It was not the best kept motel. The
20 people were really rude.
21 Q. Okay.
22 A. The surrounding area -- Like, it had a
23 lot of trash and stuff on the ground around it and it
24 was not -- If you -- Even if you weren't homeless, and
25 just vacationing, it is not one that would have the

Page 18

1  best rating.
2  Q. Okay. What did -- Well, scratch that.
3    Did you witness what you believed to be
4  commercial sex at the motel?
5  A. Yes.
6  Q. Can you tell me about what you witnessed
7  and what that looked like.
8  A. There was always cars coming and going,
9  women getting in and out of cars. They would stand
10 outside of their rooms a lot. Sometimes guys would
11 walk in the room. They'll do whatever they're doing.
12 I could never say exactly what was going on in the
13 room, but then they would always walk out. So it was
14 forever -- as I said, it was forever rocking. It was
15 always activity, 24 hours a day.
16 Q. Okay. How often did you see that -- that
17 kind of activity? Like, every day that you were there
18 or -- or once a week or what?
19 A. I would say every day.
20 Q. Okay. And you said it was -- it was
21 rocking.
22    Like, roughly how many -- how many girls
23 are we talking about that you saw that you thought
24 were engaged in commercial sex at the motel?
25 A. At the most, maybe six.

Page 19

1  Q. Okay. Let me -- No. That's okay.
2    Where on the property did -- did this
3  take place? Was it concentrated in any particular
4  area of the motel or was it all over the place?
5  A. It was all over the place. It was no
6  particular side of the hotel.
7  Q. Okay. What did these girls that you saw
8  who you thought were engaged in commercial sex,
9  what -- what did they look like?
10 A. They were girls of different races. Some
11 of them looked to be older than what they appeared.
12 So they may have been younger but they looked older.
13 Q. Okay. What -- What kind of clothes were
14 they wearing?
15 A. Kind of scantily clad clothes.
16 Q. Okay. Did you ever see anyone be violent
17 with any of these girls?
18 A. No.
19 Q. Okay. You said that there were men
20 driving up in the area.
21    Can you tell me what -- what that looked
22 like.
23 A. Some of the cars had rim tint. They're
24 never newer cars.
25 Q. How -- How frequently would you see a car

Page 20

1  pull up that you -- you thought was a person coming to
2  the motel to buy sex?
3    MS. MERRILL: Objection.
4  A. Throughout the day.
5    BY MR. TONGE:
6  Q. Throughout the day?
7  A. Uh-huh (affirmative).
8  Q. Okay.
9  A. So, I mean, I was there at different
10 times because sometimes I would have to leave out to
11 either run my kids to the bus stop or be walking back
12 from the bus stop with them. Or at that time, if I
13 was driving, same thing.
14 Q. Okay. And were -- so were you -- were
15 you working at all during that time? Or were you just
16 taking your kids to school and you would be at the
17 motel all day? What was your -- your kind of daily
18 routine?
19 A. When I first got there, no. But I
20 believe at one point -- Because I was homeless for
21 about two years on and off. At one point I was
22 working with Lyft and Uber.
23 Q. Okay.
24 A. So sometimes I would leave out to go work
25 and sometimes I would come back in and there were

Page 21

1 times that I wasn't working.
2 Q.  On the times that you weren't working,
3 other than taking your kids to the -- to the bus stop,
4 did you stay around the motel during the day?
5 A.  Uh-huh (affirmative).  I didn't go very
6 far.
7 Q.  Okay.  And did this activity, the
8 commercial sex activity, was that -- would that go on
9 during the day and at night or was it more frequent
10 one or the other?
11 A.  No, not one frequent more than others.
12 Throughout the entire day.
13 Q.  Okay.  These girls that you saw engaged
14 in commercial sex:  Did you see them -- any of them
15 look fearful or -- or stressed or paranoid?
16 A.  They looked tired.  I would say worn out.
17 Q.  Okay.  And did -- did you see --
18    The -- The men that you saw coming to --
19 that you believe were coming to buy sex at the motel:
20 Would they go into rooms at the motel or would they --
21 what would they do?
22 A.  (Audio glitch) --
23 Q.  You tell me.
24 A.  -- just go into the rooms.  A lot of time
25 I would see some people maybe walk in and walk out.

Page 22

1 But for the most part, they got in the car and would
2 leave.
3 Q.  And so -- so a man would drive up to the
4 motel in a car and --
5 A.  -- pick women up and then leave, and then
6 they'll come back and drop them off.
7 Q.  Okay.  Were you ever put out of the motel
8 or threatened to be put out of the motel?
9 A.  Not that I remember.
10 Q.  Okay.
11 A.  As I said, it was -- it's been so long.
12 Q.  Okay.  Did you see men that you thought
13 were pimps at the Super 8?
14    MS. MERRILL: Objection.  Speculation.
15    BY MR. TONGE:
16 Q.  You can answer.
17 A.  I didn't hear the question.
18 Q.  Did you see men that you thought were
19 pimps at the Super 8?
20 A.  I saw guys that I thought were pimps.
21 But, I mean, this day and age, you don't know exactly
22 what a pimp looks like.  But, yeah, I saw guys with
23 their pants hanging down.  A lot of times they had
24 joints and stuff in their mouth.  But yeah.
25 Q.  And --

Page 23

1 A.  A lot of -- Some girls go with them
2 sometimes and then come back.
3 Q.  Okay.  That was my next question.
4    So you saw -- Did you see these men that
5 you thought might be pimps interacting with the girls
6 that you thought were engaged in commercial sex?
7 A.  Yes.
8 Q.  Okay.  Did you ever see the -- the men
9 that you thought might be pimps use derogatory
10 language or -- or -- or yell at the girls that were
11 involved in commercial sex?
12 A.  Not yelled, but they were called out of
13 their names, yes.
14 Q.  They were what?  Could you say that last
15 part again.
16 A.  Called out of their names.  They were
17 called explicitives.
18 Q.  Oh, okay.  Well, I'll -- I'll say those
19 words, and -- and you tell me if I'm correct.
20    Did they -- Like, did you hear those men
21 call the girls that you thought were engaged in
22 commercial sex bitch or bitches?
23    MS. MERRILL: Objection.  Hearsay.
24    BY MR. TONGE:
25 Q.  And --

Page 24

1    THE COURT REPORTER: I didn't hear an
2 answer.
3    BY MR. TONGE:
4 Q.  Yeah.  Could you say your answer.
5 A.  Yes.
6    THE COURT REPORTER: Thank you.
7    BY MR. TONGE:
8 Q.  Did you hear them call them hoes?
9    MS. MERRILL: Objection.  Hearsay.
10 A.  No hoes.
11    BY MR. TONGE:
12 Q.  Okay.  Did you hear them call them sluts?
13 A.  No.
14    MS. MERRILL: Objection.  Hearsay.
15    BY MR. TONGE:
16 Q.  Okay.  That's probably good.  I -- I
17 don't want to just make up words.
18    And did you see these men that you
19 thought might be pimps loitering around in the hotel
20 in the parking lot or the hallways?
21 A.  Always.  It was forever people walking
22 back and forth.
23 Q.  Okay.  Do you know -- Do you know what
24 sex trafficking is?
25 A.  I do.

E.M./D.H. v.
Tucker Inn, et al

March 3, 2023

Page 25

1  Q.  Can you tell me what -- what you
2  understand sex trafficking to be.
3  A.  Sex trafficking, from what I've seen just
4  even in the movies or from hearing stories, is where a
5  group of women or boys or girls are taken and sold for
6  sex.
7  Q.  Okay.  And I -- I'll just represent to
8  you that the legal definition of sex trafficking under
9  federal law in these cases is a person who's being
10  made to engage in commercial sex through force, fraud,
11  or coercion or if the person is under the age of 18
12  years old.
13  So is -- is there any way for you to know
14  for sure that -- that a girl or a woman that you saw
15  that you thought was engaged in commercial sex was
16  being -- doing that because she wanted to or that she
17  was doing that because someone was making her?
18  A.  Not --
19  MS. MERRILL: Objection.
20  A.  -- unless someone told me, no.
21  BY MR. TONGE:
22  Q.  Okay.
23  THE COURT REPORTER: I'm sorry.  Repeat
24  that answer.
25  A.  Not unless someone told me, no.

Page 26

1  BY MR. TONGE:
2  Q.  Okay.
3  THE COURT REPORTER: Thank you.
4  BY MR. TONGE:
5  Q.  Let's see.
6  The activity that you described when --
7  when you said the buyers would -- would drive up
8  and -- and what you saw more of was -- was buyers
9  driving up and picking up girls in the parking lot; is
10  that correct?
11  A.  Correct.
12  Q.  So where were these girls standing?
13  Like, how -- how did -- how did the buyer --
14  A.  (Indiscernible crosstalk.)
15  Q.  -- get a girl into his car?
16  I'm -- I'm sorry.  Now -- Now you answer.
17  Sorry.
18  A.  In front of their doors.
19  My apologies.
20  Q.  So the -- So the girls would be standing
21  in front of the door to the room that they were
22  staying at at the motel, you think?
23  A.  Yes.
24  Q.  Okay.  Was -- Was the activity, the
25  commercial sex activity that you saw, was it out in

Page 27

1  the open or was it clandestine, or hidden?
2  A.  I wouldn't say that it was directly out
3  in the open, but they would always come back with
4  their clothes disheveled.
5  Q.  Like when they got dropped off by a man
6  afterwards?
7  MS. MERRILL: Objection.  Leading.
8  A.  Yes.
9  BY MR. TONGE:
10  Q.  Okay.  The women that you described
11  standing outside and the men driving up to pick them
12  up for -- for commercial sex:  Could that activity be
13  seen from the -- from the front office of the motel?
14  A.  Not unless they had cameras angled that
15  way.  But they did have cables -- I'm sorry --
16  cameras.  So I couldn't really tell you honestly.  I
17  don't know.
18  Q.  Okay.  If --
19  A.  But it's --
20  Q.  I'm sorry.
21  A.  -- kind of open because they're -- The
22  office people were -- The housekeepers were always
23  moving, so I'm sure they saw.  But nobody ever really
24  responded.  But not, looking at this picture, unless
25  they actually came out of the office from the side,

Page 28

1  would they be able to actually tell.
2  Q.  Okay.  If someone from the motel that
3  worked there was standing in the parking lot, would
4  they be able to have seen this activity?
5  MS. MERRILL: (Unintelligible.)
6  A.  Oh, yes.  Most definitely.
7  Q.  Okay.
8  THE COURT REPORTER: Excuse me.
9  Ms. Merrill, I didn't hear what you just
10  said.
11  MS. MERRILL: Objection.  Speculation.
12  THE COURT REPORTER: Thank you.
13  BY MR. TONGE:
14  Q.  Do you think that the people that worked
15  at the motel knew that this commercial sex activity
16  was going on?
17  MS. MERRILL: Objection.  Speculation.
18  BY MR. TONGE:
19  Q.  You can answer.
20  A.  Yes, I do.
21  Q.  Okay.  What's the basis of -- of that
22  opinion?  Like, what makes you --
23  A.  They --
24  Q.  I'm sorry --
25  A.  -- were always going around the -- the

Page 29

1   hotel all throughout the day, so -- Even all the
2   managers, they always walked the entire property.  So
3   there's no way that you could not have seen what was
4   going on.  You may not say anything about it, but it
5   was still obvious.
6   Q.  Okay.  And so to confirm:
7       Did you see the employees of the motel
8   walking around the property and -- and --
9   A.  Throughout the day.
10  Q.  -- (indiscernible crosstalk) aware this
11  was occurring?
12  A.  Yes.
13  Q.  Okay.  Did you ever hear or see any hotel
14  employee do -- do or say anything to --
15  A.  No.
16  Q.  -- deter to stop this activity?
17  A.  No, sir.
18      THE COURT REPORTER: Excuse me just one
19  moment.
20      Ms. Harris, if you would, let him finish
21  his question.  I'm -- I -- You're talking at
22  the same time again.
23      THE WITNESS: My apologies.
24      THE COURT REPORTER: Thank you.
25      MR. TONGE: Okay.  It's a weird thing to

Page 30

1   do the first time.
2       BY MR. TONGE:
3   Q.  Was there any security at that hotel that
4   you were aware of?
5   A.  Not that I remember.
6   Q.  Okay.  Did you see people selling drugs
7   at the hotel?
8   A.  No.
9   Q.  Okay.  And I'm just going to go to Page 5
10  here.
11      Can you see this zoom-out picture?
12  A.  Yes.
13  Q.  Okay.  And in that police report and --
14  you had said that you had previously come from the
15  Motel 6 in Tucker and so --
16      Is that correct that you had stayed at
17  the Motel 6 before you came to the Super 8?
18  A.  Yes.
19  Q.  Could you tell me about just the area
20  generally, your impression of that -- that -- this
21  intersection in the picture here.
22  A.  That area was a very poor area.
23  Q.  Okay.  And in what way?
24  A.  There was always trash and stuff on the
25  ground, even walking from -- walk from one hotel to

Page 31

1   the next.  Because the bus stop was in between these
2   hotels.  So yeah.
3   Q.  Where was the bus stop?  Can you see it
4   on this picture or...
5   A.  Can you blow it up.
6   Q.  I can zoom in, yeah, but it's a -- it's a
7   static picture.  I'm not on Google Maps.
8   A.  Sure.  The homeless people -- It was kind
9   of -- How do you say -- When you see where the circle
10  is, that little --
11  Q.  This circle?
12  A.  No.  Go to the left.  Left.  Right before
13  you pass the little blue spot right here.
14  Q.  Okay.  I can't see where you're pointing,
15  but...
16  A.  Where your mouse is pointing, it was kind
17  of right there where you see the sand and the trees
18  are.
19  Q.  Oh.  Right -- Okay.  Right in here?
20  A.  Yes.
21  Q.  Right close -- close to the Motel 6 then?
22  A.  Correct.
23  Q.  Okay.  So when you walked from the
24  Super 8, you -- you walked down the highway, over the
25  overpass, and -- and basically almost all the way to

Page 32

1   the Motel 6 to get to the bus stop?
2   A.  Correct.
3   Q.  Okay.  Did you see signs of commercial
4   sex happening at the Motel 6 when you stayed there?
5   A.  I did, yeah.
6   Q.  And what was it like?  Was it -- Was it
7   similar to the Super 8?  Was it -- Was it --
8   A.  It was the same.
9   Q.  -- less -- less or more?
10  A.  No.  It was the same because they would
11  rotate in between those hotels that were on that
12  strip.
13  Q.  Okay.  How long -- Do you recall about
14  how long you stayed at the Motel 6?
15  A.  No.
16  Q.  Okay.  And did you ever stay at the
17  Masters Inn or the Knights Inn in this picture?
18  A.  I stayed at the -- the Knights Inn for a
19  couple weeks; the Masters Inn maybe a couple days.
20  Q.  Okay.  Did you see signs of -- the same
21  signs of commercial sex that you described about the
22  Super 8 at either of those two locations?
23  A.  I saw it at every one except for the
24  Masters Inn.  The Masters Inn was a little bit more
25  strict.

E.M./D.H. v.
Tucker Inn, et al

March 3, 2023

Page 33

1 Q.  Okay.
2 A.  Like you couldn't stand outside your
3 room.  You had to be in your room by a certain time.
4 Nobody could really loiter or do anything on that
5 property in comparison to the other ones.
6 Q.  Okay.  And so at -- at the Knights Inn,
7 there was a similar level of -- of commercial sex
8 activity as what -- what you had described at the
9 Super 8 and the Motel 6?
10 A.  Yes, sir.
11 Q.  Okay.  Do you remember about how long
12 you -- you ended up staying at the Super 8?
13 A.  No.
14 Q.  Was it a period -- Like, you know, was
15 it -- Was it weeks or months or a year or any idea --
16 A.  I can't specifically remember.  I would
17 have to look at my email to see if I could find my
18 receipts.
19 Q.  Okay.  Do you think that you stayed there
20 for -- for more than a month?
21 A.  Maybe a month, maybe two.
22 Q.  Okay.
23     MR. TONGE: Okay.  I think that's all
24 I've got.
25     And, Marissa, I'm going to take this down

Page 34

1 unless you want me to leave it up.
2     MS. MERRILL: No.  That's great.  You can
3 take it down.  Thank you.
4     EXAMINATION
5     BY MS. MERRILL:
6 Q.  Ms. Harris, good afternoon.  My name is
7 Marissa Merrill.  I represent the hotel in this case,
8 and I have a couple questions for you this afternoon.
9 Okay?
10 A.  Okay.
11 Q.  I think you said that you can't really
12 remember how long you were at the Super 8, but it
13 sounds like you were there for at least a month?
14 A.  Yes.
15 Q.  Of the three hotels I think you just
16 mentioned that you had stayed at in that area -- or
17 maybe it's the four hotels -- but the Super 8, the
18 Motel 6, the Masters Inn, and the Knights Inn -- do
19 you remember which one you stayed at the longest?
20 A.  No.
21 Q.  Do you remember which one you went to
22 first?
23 A.  No.
24 Q.  Okay.  Why is it that you moved from the
25 Motel 6 to the Super 8?

Page 35

1 A.  Whenever I felt like I could get a better
2 rating for the extended time I was staying, I went to
3 a different one.
4 Q.  Okay.  And tell me what the check-in
5 or -- or room rental process was like at the Super 8.
6 A.  I don't remember.
7 Q.  Okay.  Did you have to pay in advance for
8 multiple days or did you go back daily to pay for your
9 room --
10 A.  No.  At -- No.  You could do daily, a few
11 days, weekly.  And it also depended on if I had help
12 paying for my room.
13 Q.  Do you remember which one you did or did
14 it vary?
15 A.  It varied depending on my situation at
16 that time.
17 Q.  Okay.  When you would go back to the
18 front desk to keep on renting your room for whatever
19 period of time you needed it, did you ever mention any
20 of your concerns about what you saw on the property to
21 any of the staff?
22 A.  I did.  But they really didn't say
23 anything.
24 Q.  What did you say to them?
25 A.  Do you see the activities that's going on

Page 36

1 the side and how the cars keep coming back and forth?
2 Q.  Do you remember who you said that to?
3 A.  The front desk.  But who it was, I don't
4 remember the person's name.
5 Q.  Okay.  You don't remember his name, but
6 can you describe him for me?
7 A.  One was a older gentleman.  He was bald.
8 Q.  Do you have any idea of how tall he was,
9 how short he was?
10 A.  No.  Well, I'm short, so everybody is
11 taller than me.  I'm only 5 feet, so a lot of people
12 are taller than me.  But the exact height, no.
13 Q.  Okay.  Do you have any of the
14 descripting -- descripting factors of him?
15 A.  No, ma'am.
16 Q.  Okay.  You mentioned -- You said "one of
17 them."
18     So did you tell multiple people about
19 your concern?
20 A.  It was a lady that was there with a long
21 ponytail to probably maybe her arm length of her
22 shoulder, right where -- start right here.
23 Q.  Do you remember anything more about her?
24 A.  No.
25 Q.  Do you know her name?

E.M./D.H. v.
Tucker Inn, et al

March 3, 2023

1  A.  It's been so long, no.
2  Q.  Did you tell those two people together at
3  the front desk?
4  A.  Different times.
5  Q.  Different times?
6      Do you remember when it may have been
7  that you told them this?
8  A.  When I made a complaint because there was
9  another young lady that stayed there that ended up
10  getting kicked out and I said, well, it's kind of
11  unfair you all are kicking people out who are here
12  trying to take care of their families but you're not
13  kicking the people that are causing the traffic here.
14  Q.  Do you have any idea of, like, was that
15  closer to when you first started staying there or
16  towards the end of your stay?
17  A.  Towards the end.
18  Q.  Why did you leave the Super 8?
19  A.  I know I got assistance from another
20  program that helped me get a place to stay.
21  Q.  What's the name of that program?
22  A.  Nicholas House.
23  Q.  Nicholas -- what's the last part?
24  A.  House.
25  Q.  House?

1  A.  Uh-huh (affirmative).
2  Q.  Making sure I heard that correctly.
3      And so where -- where did you go after
4  leaving the Super 8?
5  A.  Nicholas House gave me and my kids to
6  stay -- I forgot how long -- for maybe a week or two,
7  and then they helped me get a place to stay in
8  Conyers.
9  Q.  Was it another hotel?
10  A.  No.  They helped me get an apartment in
11  Conyers.
12  Q.  Gotcha.  Okay.
13      Okay.  So for the -- What did you say?
14  It was two months that you stayed at the Super 8?
15  A.  Maybe a month, maybe two.  I don't
16  remember the exact time period.
17  Q.  Okay.  So during the one to two months
18  that you stayed at the Super 8, you were staying there
19  with your two children; right?
20  A.  Yes.
21  Q.  And it was your 11-year-old son and a
22  15-year-old girl?
23  A.  Yes.
24  Q.  So even though that you had made
25  complaints to the front desk staff where you were

1  concerned about what you were seeing on the property,
2  you continued to stay there with your children for the
3  one-to-two-month period; is that right?
4  A.  Yes.  Sadly, in my opinion, when I went
5  through my storm, beggars can't be choosers, so you do
6  what you have to do until then, until you can do
7  better.
8  Q.  Did you ever interact with any of the
9  people engaged in any of the activity that you were
10  concerned about?
11  A.  No.  Just other young mothers like
12  myself.  No.
13  Q.  Were there other -- So were there other
14  young mothers there with their children --
15  A.  Yes.
16  Q.  -- staying there for periods of time too?
17  A.  Yes.
18  Q.  Do you remember any of those women's
19  names that stayed with you there?
20  A.  No.
21  Q.  Earlier you were asked a bunch of
22  questions about girls that you saw on the property.
23  And I know that we were using the term "girls," but I
24  was wondering:
25      Do you happen to know any of those

1  women's ages?
2  A.  No.
3  Q.  I know that you said you made some
4  complaints where you addressed your concerns to the
5  front desk staff and you can't remember when that was.
6      Did you ever address any concerns with
7  any police?
8  A.  Not that I remember, no.
9  Q.  Okay.  Did you ever witness police on the
10  property at this (indiscernible crosstalk) --
11  A.  Police -- Now, that I can tell you.
12  Police always rotated between the properties because
13  they would always just pop up because -- I can't say
14  for sure there were drugs, but you would smell weed
15  smell in the air.  So they were always frequenting
16  each location.
17  Q.  And was it where they would just kind
18  of --
19      In the pictures, it described that you
20  could kind of drive through the -- or around the
21  hotel.
22      Is that what they would do?
23  A.  Yes, ma'am.  Yes.
24  Q.  Did the police kind of drive around the
25  hotel like that multiple times a day or each day?  Do

E.M./D.H. v.
Tucker Inn, et al

March 3, 2023

---

Page 41

1  you remember the frequency?
2  A.  Not day, but they definitely was in the
3  area a lot.
4  Q.  Did you ever see any of the police
5  officers when they're riding through the property
6  interact with any of the people that you saw --
7  A.  No.
8  Q.  -- engaged in the activity?
9  A.  No.
10  Q.  The activity that you described as -- The
11  activity that you saw that you would describe as
12  commercial sex activity:  Did that occur in front of
13  police when they would drive by?
14  A.  No.
15  Q.  What about the girls that you said would
16  walk around in scantily clad clothing:  Were they
17  around when police would drive by?
18  A.  No.
19  Q.  Do you know what these people did when
20  police were driving by?  Did you see that?
21  A.  No.
22  Q.  You said that the staff at the hotel was
23  always walking around the property.
24       Describe that for me.  What did you see?
25  A.  Well, they were always walking around.

---

Page 42

1  Some of them I believe lived on the property.  So they
2  were always walking around the property.  They would
3  bring people their towels or toiletries or anything if
4  you asked for extra.  And sometimes you could come to
5  the front desk and get extra if you need it.
6       And you definitely had the people that
7  cleaned the apart- -- well, we called them our
8  apartments at that time, the rooms.  Whether it was on
9  a daily basis or a weekly basis.
10  Q.  Do you know whether or not any of the
11  hotel staff ever called the police for anything
12  occurring at the property?
13  A.  No.
14  Q.  Did you ever consider leaving the
15  property with your children while you were there?
16  A.  I did.  But I didn't have enough money to
17  get on my feet at that point.
18  Q.  Okay.  Did you ever consider moving to
19  one of the other hotels in the area that you described
20  in that picture --
21  A.  I did at different points, yes.
22  Q.  So was there a time where you left the
23  Super 8 hotel to go move to another hotel and then you
24  came back to the Super 8?
25  A.  Being that long ago, I don't remember.

---

Page 43

1  But I can tell you I moved between all of them.
2  Q.  Okay.  But you don't remember the time
3  frames that you were at each.
4  A.  No.
5  Q.  Okay.  I know you said that at some point
6  you were working for Lyft and Uber.
7       So did you have a vehicle?
8  A.  Yes.
9  Q.  I had asked you about the -- the two
10  staff members that you remember speaking to in -- in
11  the front desk.
12       Do you remember any of the other staff
13  members that you interacted with?
14  A.  No.
15  Q.  Do you remember any of the staff members
16  who would walk around the property?  Did you ever
17  speak to them and get their names, by chance?
18  A.  No.
19  Q.  You talked about this a little bit
20  earlier, but I want you to just -- to tell me again:
21       What is it that you saw that made you
22  think commercial sex activity was taking place at the
23  property?
24  A.  Vehicles coming back and forth.  Women
25  leaving, coming back and forth.  They would come back

---

Page 44

1  and their clothes, as I said it before, would be
2  disheveled.  They were always getting in and out of
3  different cars.
4  Q.  But you didn't see what would happen
5  inside the vehicles or inside the rooms; right?
6  A.  No.
7  Q.  And I think you had also said that this
8  did not occur directly out in the open?  So they
9  would --
10  A.  No.
11  Q.  -- have them in their -- then in the
12  cars?
13  A.  They would leave and come back.
14  Q.  Okay.  Just a couple more questions for
15  you.  I'm almost done.
16       How did you meet the attorneys here today
17  that were on Zoom with us, Jonathan Tonge and Trinity
18  Hundredmark?  I don't know if you met Ms. Hundredmark,
19  but I know you've spoken to Mr. Tonge before.
20  A.  Ms. Kathy, the detective, reached out to
21  me.
22  Q.  Kathy.  What's her last name?
23  A.  I don't know Ms. Kathy's last name.
24  Q.  Okay.  Do you have --
25  A.  I'd know when I see her because she

---

Page 45

1 actually came to my house. But remembering her last
2 name, I never saved it in my phone, so I don't know
3 her last name. I just called her Ms. Kathy.
4 Q. I gotcha. Do you remember when that was?
5 A. Sometime last year.
6 Q. What did you talk to Ms. Kathy about?
7 A. She let me know what the situation was
8 and that she wanted to speak to me about my stay there
9 and whatever I saw.
10 Q. When you say "what the situation was":
11 What did you understand that to be?
12 A. Sex trafficking.
13 Q. All right. What did Ms. Kathy tell you
14 about sex trafficking?
15 A. That there was a situation with a young
16 girl that got hurt there, so she wanted to ask me some
17 questions about my stay there and if I remembered
18 anything.
19 Q. Do you remember what you told her?
20 A. Not everything in detail, no.
21 Q. Okay. What can you remember what you
22 told her?
23 A. I told her the same thing you all -- I've
24 told you all today, as much as I could remember about
25 the stuff that I saw and the traffic going back and

Page 46

1 forth.
2 Q. Okay. Are you being represented by
3 counsel during this dep- -- this deposition?
4 A. No.
5 Q. Have you ever considered filing a lawsuit
6 against this hotel?
7 A. No.
8 Q. Have you been offered any compensation or
9 any money for your testimony today or for your time
10 today?
11 A. No.
12 Q. And you and I have never met before
13 today; is that right?
14 A. No, ma'am.
15 Q. And another attorney I work with, his
16 name is Roger Harris.
17     Have you ever spoken to Mr. Harris about
18 this case or ever before today?
19 A. No.
20 Q. I may have asked this and I can't
21 remember, so I apologize:
22     But sitting here today, do you recall the
23 names of any women or any girls who lived at the
24 Super 8 with you while you were there?
25 A. No.

Page 47

1     MS. MERRILL: Okay. All right. I think
2 those are all my questions. Thank you very
3 much for your time, Ms. Harris.
4     MR. TONGE: I -- I just --
5     THE WITNESS: You're welcome.
6     MR. TONGE: I have one more actually.
7     FURTHER EXAMINATION
8     BY MR. TONGE:
9 Q. Ms. Harris, when you were staying at --
10 at the Super 8, do you recall did the rooms have
11 telephones in them?
12 A. Back then, yes.
13 Q. Okay. That's what I was wondering.
14 A. Yes.
15     MR. TONGE: That's all I got.
16     THE WITNESS: Yes, sir.
17     MR. TONGE: Okay.
18     THE VIDEOGRAPHER: This concludes the
19 video deposition. The time is 6:10 p.m. and we
20 are off the record.
21     (Off the video record.)
22     THE COURT REPORTER: Did we discuss
23 signature?
24     MR. TONGE: Ms. Harris, so you have the
25 right to read and sign the deposition, which

Page 48

1 means that they could send it to me and I
2 could -- I could send it to you. Or they could
3 send it directly to you via email.
4     But you have the option to read through
5 the deposition and, if you said anything
6 incorrect or -- or, you know, you -- you know,
7 you said no and you meant yes or, like, there's
8 just an error in what you said, you can correct
9 that and then sign it.
10     So, like, you can review it and then make
11 any corrections you want and then sign it; or
12 you can waive that right and -- and just say,
13 I'm done, and, you know, that's it.
14     So would you like to review and sign it,
15 or would you like to not do that?
16     And any of the other lawyers can jump in
17 if they feel like I explained that badly.
18     THE WITNESS: I don't want to sign it,
19 but I do want to review it.
20     MR. TONGE: Well --
21     THE WITNESS: So I can make a decision
22 if --
23     Does it have to be done today or can it
24 be done tomorrow? Because I have other things
25 I have to do --

E.M./D.H. v.
Tucker Inn, et al

March 3, 2023

---

Page 49

1    MR. TONGE: How much -- Do y'all know how
2  much time she has?
3    So what we'll do is we'll say that you'll
4  read and sign.  And -- And if you do not
5  return it -- I think there's a time limit.
6    Do you know, Laura, what the time limit
7  is?
8    THE COURT REPORTER: You have 30 days.
9  So that means you have 30 days once the
10  transcript is completed to read and sign.
11    MR. TONGE: Okay.  So you get it and you
12  have 30 days to do it.  If you don't do it
13  within 30 days, then it's presumed that it's
14  correct.  Okay?
15    So, like, if you -- if you don't sign it,
16  then that means that you're okay with it;
17  right?  So if you want to make a change, you
18  have to return it within 30 days with your
19  signature.
20    So if you change any -- if you feel like
21  you need to change anything, then you do need
22  to return it with a signature and the changes
23  that you wrote out.  If you don't feel like you
24  need to change anything, you don't have to do
25  anything and after 30 days it's -- it's deemed

---

Page 51

1              C E R T I F I C A T E
2            I hereby certify that the foregoing
   transcript was reported, as stated in the caption;
3  that the witness was duly sworn and elected to reserve
   signature in this matter; that the colloquies,
4  questions and answers were reduced to typewriting
   under my direction; and that the foregoing pages 1
5  through 50 represent a true, correct, and complete
   record of the evidence given.
6            I further certify that I am not
   disqualified for a relationship of interest under
7  O.C.G.A. 9-11-28(c); that I am a Georgia Certified
   Court Reporter here as a representative of D'Amico &
8  Associates, Inc.; that I/D'Amico & Associates was
   contacted by the party taking the deposition to
9  provide court Reporting services for this deposition;
   that I will not be taking this deposition under any
10  contract that is prohibited by O.C.G.a. 15-14-37(a)
   and (b) or Article 7C of the Rules and Regulations of
11  the Board; and by the attached disclosure form I
   confirm that I/D'Amico & Associates is not a party to
12  a contract prohibited by O.C.G.A. 15-14-37 or Article
   7C of the Rules and Regulations of the Board.
13            The above certification is expressly
   withdrawn and denied upon the disassembly or
14  photocopying of the foregoing transcript, unless said
   disassembly or photocopying is done under the auspices
15  of D'Amico & Associates, Inc. and the signature and
   original seal is attached thereto.
16            This, the 16th day of March, 2023.
17
18
19
20            LAURA B. GILDENBERG, CCR-B-1810
21
22
23
24
25

---

Page 50

1  to be, you know, that you -- you reviewed it
2  and you feel like it's correct, so...
3    THE WITNESS: Okay.
4    MR. TONGE: Yeah.  So we'll -- So you
5  will read and sign it.
6    (Discussion off the record.)
7    THE COURT REPORTER: And, Counsel, did
8  you both want to order an electronic copy of
9  this deposition?  And does anyone need it
10  expedited?
11    MR. TONGE: Regular is fine for me and,
12  Styles, we'll take that video synched also.
13    THE VIDEOGRAPHER: Ms. Merrill?
14    MS. MERRILL: I'll take, yeah, so just a
15  regular PDF E-Tran, no rush, and I will take a
16  copy of the video as swell.
17    THE VIDEOGRAPHER: Do you want it synched
18  to the transcript, Ms. Merrill?
19    MS. MERRILL: Yes.
20  (The deposition concluded at 6:14 p.m. EST.)
21    - - -
22
23
24
25

---

Page 52

1          E R R A T A   S H E E T
2
3            Pursuant to Rule 30(e) of the Federal
   Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),
   any changes in form or substance which you desire to
4  make to your deposition testimony shall be entered
   upon the deposition with a statement of the reasons
5  given for making them.
6            To assist you in making any such
   corrections, please use the form below.  If
7  supplemental or additional pages are necessary,
   please furnish same and attach them to this errata
8  sheet.
9              - - -
10
11            I, the undersigned, TONYA SHERRON SMITH
   HARRIS, do hereby certify that I have read the
12  foregoing deposition and that said transcript is
   true and correct, with the exception of the
13  following changed noted below, if any:
14
   Page_____/Line_____/Should Read:_____
15  _____
16  _____
   Reason: _____
17
18
   Page_____/Line_____/Should Read:_____
19  _____
20  _____
   Reason: _____
21
22
   Page_____/Line_____/Should Read:_____
23  _____
24  _____
   Reason: _____
25  (continued)

---

**E.M./D.H. v.**
**Tucker Inn, et al**

March 3, 2023

Page 53

```
1    Page_____/Line_____/Should Read:_____
2    _____
3    Reason: _____
4
5    Page_____/Line_____/Should Read:_____
6    _____
7    Reason: _____
8
9    Page_____/Line_____/Should Read:_____
10   _____
11   Reason: _____
12
13   Page_____/Line_____/Should Read:_____
14   _____
15   Reason: _____
16
17   Page_____/Line_____/Should Read:_____
18   _____
19   Reason: _____
20
21                    _____
22                         TONYA SHERRON SMITH HARRIS
23   Sworn to and subscribed before me,
24   _____, Notary Public.
25   This _____ day of _____, _____.
     My Commission Expires:
```

**[**

[sic] (1)
  15:7

**A**

able (2)
  28:1,4
According (1)
  15:11
accurate (3)
  11:2;12:9,20
activities (1)
  35:25
activity (18)
  18:15,17;21:7,8;
  26:6,24,25;27:12;
  28:4,15;29:16;33:8;
  39:9;41:8,10,11,12;
  43:22
actually (4)
  27:25;28:1;45:1;
  47:6
address (2)
  9:20;40:6
addressed (1)
  40:4
advance (1)
  35:7
advise (2)
  15:14;16:12
advised (1)
  15:21
affirmative (5)
  11:11;13:24;20:7;
  21:5;38:1
affirmatively (1)
  9:10
afternoon (2)
  34:6,8
afterwards (1)
  27:6
again (4)
  8:22;23:15;29:22;
  43:20
against (1)
  46:6
age (2)
  22:21;25:11
ages (1)
  40:1
ago (5)
  13:4,4;15:15;16:13;
  42:25
agree (1)
  8:11
agreement (1)
  7:11
ahead (2)
  10:5;13:7
air (1)

40:15
Alexander (1)
  17:10
almost (2)
  31:25;44:15
always (16)
  18:8,13,15;24:21;
  27:3,22;28:25;29:2;
  30:24;40:12,13,15;
  41:23,25;42:2;44:2
America's (1)
  11:23
angled (1)
  27:14
anticipate (1)
  9:1
apart- (1)
  42:7
apartment (1)
  38:10
apartments (1)
  42:8
apologies (2)
  26:19;29:23
apologize (1)
  46:21
appeared (1)
  19:11
area (12)
  11:19;12:1,6,10;
  17:22;19:4;30:19,22,
  22;34:16;41:3;42:19
arm (1)
  36:21
around (15)
  15:17;16:6;17:23;
  21:4;24:19;28:25;
  29:8;40:20,24;41:16,
  17,23,25;42:2;43:16
arrival (1)
  15:9
Ashya's (1)
  17:14
assistance (1)
  37:19
Atlanta (1)
  15:20
attorney (1)
  46:15
attorneys (1)
  44:16
audible (1)
  10:13
Audio (1)
  21:22
August (3)
  14:13;15:3;16:6
aware (2)
  29:10;30:4
away (1)
  15:6

**B**

back (18)
  16:10,20;20:11,25;
  22:6;23:2;24:22;27:3;
  35:8,17;36:1;42:24;
  43:24,25,25;44:13;
  45:25;47:12
bad (1)
  8:19
badly (1)
  48:17
bald (1)
  36:7
Barely (1)
  14:7
basically (1)
  31:25
basis (3)
  28:21;42:9,9
beggars (1)
  39:5
believing (1)
  15:5
Best (3)
  11:23;17:19;18:1
better (2)
  35:1;39:7
birth (1)
  9:15
bit (3)
  14:8;32:24;43:19
bitch (1)
  23:22
bitches (1)
  23:22
blow (1)
  31:5
blue (1)
  31:13
both (1)
  50:8
bottom (1)
  12:3
Boulevard (4)
  11:4;12:15,24;15:5
boys (1)
  25:5
brief (1)
  15:12
bring (1)
  42:3
bunch (1)
  39:21
bus (6)
  20:11,12;21:3;31:1,
  3;32:1
buy (2)
  20:2;21:19
buyer (1)
  26:13
buyers (2)

26:7,8

**C**

cables (1)
  27:15
call (3)
  23:21;24:8,12
called (7)
  15:5;23:12,16,17;
  42:7,11;45:3
came (4)
  27:25;30:17;42:24;
  45:1
cameras (2)
  27:14,16
Camry (1)
  9:22
can (34)
  7:24;8:19;9:3,8;
  10:12,16;11:8,20;
  13:13;14:23,23;15:1;
  17:17;18:6;19:21;
  22:16;25:1;28:19;
  30:11;31:3,5,6;34:2;
  36:6;39:6;40:11;43:1;
  45:21;48:8,10,12,16,
  21,23
car (4)
  19:25;22:1,4;26:15
care (1)
  37:12
cars (8)
  18:8,9;19:20,23,24;
  36:1;44:3,12
case (4)
  8:9;9:20;34:7;
  46:18
cases (2)
  7:11;25:9
causing (1)
  37:13
Center (4)
  11:4;12:15,24;15:4
certain (1)
  33:3
chance (2)
  11:10;43:17
change (4)
  49:17,20,21,24
changed (1)
  11:23
changes (1)
  49:22
charts (1)
  10:4
check-in (1)
  35:4
children (8)
  15:15;16:13;17:7,8;
  38:19;39:2,14;42:15
choosers (1)
  39:5

circle (2)
  31:9,11
city (1)
  15:20
Civil (1)
  7:9
clad (2)
  19:15;41:16
clandestine (1)
  27:1
clean (1)
  9:8
cleaned (1)
  42:7
clients (1)
  13:15
close (2)
  31:21,21
closer (1)
  37:15
clothes (1)
  19:13,15;27:4;44:1
clothing (1)
  41:16
coercion (1)
  25:11
coming (7)
  18:8;20:1;21:18,19;
  36:1;43:24,25
commercial (18)
  18:4,24;19:8;21:8,
  14;23:6,11,22;25:10,
  15;26:25;27:12;
  28:15;32:3,21;33:7;
  41:12;43:22
company (1)
  10:2
comparison (1)
  33:5
compensation (1)
  46:8
complaint (1)
  37:8
complaints (2)
  38:25;40:4
complete (1)
  8:12
completed (1)
  49:10
concentrated (1)
  19:3
concern (1)
  36:19
concerned (2)
  39:1,10
concerns (3)
  35:20;40:4,6
concluded (1)
  50:20
concludes (1)
  47:18
confirm (1)
  29:6

E.M./D.H. v.
Tucker Inn, et al

March 3, 2023

**confusing (1)**
8:20
**consider (2)**
42:14,18
**considered (1)**
46:5
**contact (1)**
15:9
**continued (2)**
6:25;39:2
**conversation (1)**
9:1
**Conyers (2)**
38:8,11
**copy (2)**
50:8,16
**corrections (1)**
48:11
**correctly (1)**
38:2
**counsel (3)**
6:10;46:3;50:7
**County (1)**
14:1
**couple (4)**
32:19,19;34:8;
44:14
**court (13)**
6:19;8:25;24:1,6;
25:23;26:3;28:8,12;
29:18,24;47:22;49:8;
50:7
**Crescent (4)**
11:4;12:14,24;15:4
**crosstalk (3)**
26:14;29:10;40:10
**current (2)**
15:16;16:14
**currently (1)**
10:1

**D**

**d/b/a (1)**
6:7
**daily (4)**
20:17;35:8,10;42:9
**date (5)**
6:3;9:14;14:12;
15:3;16:2
**day (15)**
18:15,17,19;20:4,6,
17;21:4,9,12;22:21;
29:1;9;40:25,25;41:2
**days (12)**
15:15;16:13,17;
32:19;35:8,11;49:8,9,
12,13,18,25
**decision (1)**
48:21
**deemed (1)**
49:25
**defendant (1)**

6:17
**definitely (3)**
28:6;41:2;42:6
**definition (1)**
25:8
**DeKalb (1)**
13:25
**dep- (1)**
46:3
**Department (1)**
14:1
**depended (1)**
35:11
**depending (1)**
35:15
**deposition (9)**
6:5;7:8;8:3;46:3;
47:19,25;48:5;50:9,
20
**derogatory (1)**
23:9
**describe (3)**
36:6;41:11,24
**described (7)**
26:6;27:10;32:21;
33:8;40:19;41:10;
42:19
**descripting (2)**
36:14,14
**desk (7)**
35:18;36:3;37:3;
38:25;40:5;42:5;
43:11
**detail (1)**
45:20
**detective (1)**
44:20
**deter (1)**
29:16
**DH (2)**
6:6;7:11
**different (9)**
12:13;13:12;19:10;
20:9;35:3;37:4,5;
42:21;44:3
**directly (3)**
27:2;44:8;48:3
**discuss (1)**
47:22
**Discussion (1)**
50:6
**disheveled (2)**
27:4;44:2
**done (4)**
44:15;48:13,23,24
**door (1)**
26:21
**doors (1)**
26:18
**down (8)**
10:17;13:23;14:20;
16:9;22:23;31:24;
33:25;34:3

**drive (6)**
22:3;26:7;40:20,24;
41:13,17
**driving (5)**
19:20;20:13;26:9;
27:11;41:20
**drop (1)**
22:6
**dropped (1)**
27:5
**drugs (3)**
8:15;30:6;40:14
**during (5)**
20:15;21:4,9;38:17;
46:3

**E**

**Earlier (2)**
39:21;43:20
**eight (1)**
13:4
**either (2)**
20:11;32:22
**electronic (1)**
50:8
**EM (1)**
7:12
**email (2)**
33:17;48:3
**employee (1)**
29:14
**employees (1)**
29:7
**end (2)**
37:16,17
**ended (3)**
15:21;33:12;37:9
**engage (1)**
25:10
**engaged (8)**
18:24;19:8;21:13;
23:6,21;25:15;39:9;
41:8
**enough (1)**
42:16
**entire (2)**
21:12;29:2
**error (1)**
48:8
**EST (1)**
50:20
**E-Tran (1)**
50:15
**Even (5)**
17:24;25:4;29:1;
30:25;38:24
**everybody (1)**
36:10
**exact (3)**
16:2;36:12;38:16
**exactly (2)**
18:12;22:21

**EXAMINATION (3)**
7:1;34:4;47:7
**examined (1)**
6:24
**except (2)**
7:15;32:23
**Excuse (2)**
28:8;29:18
**Exhibit (5)**
10:6,7;12:13;13:8,9
**expedited (1)**
50:10
**explained (1)**
48:17
**explicitives (1)**
23:17
**extended (1)**
35:2
**extra (2)**
42:4,5

**F**

**face-to-face (1)**
7:4
**factors (1)**
36:14
**fair (3)**
11:2;12:9,19
**fairly (1)**
14:24
**families (1)**
37:12
**far (1)**
21:6
**fearful (1)**
21:15
**Federal (2)**
7:9;25:9
**feel (4)**
48:17;49:20,23;
50:2
**feet (2)**
36:11;42:17
**felt (1)**
35:1
**few (2)**
11:7;35:10
**fight (1)**
15:23
**filing (1)**
46:5
**find (1)**
33:17
**fine (2)**
7:22;50:11
**finish (2)**
9:4;29:20
**first (7)**
6:23;13:1;15:2;
20:19;30:1;34:22;
37:15
**follows (1)**

6:24
**force (1)**
25:10
**forever (3)**
18:14,14;24:21
**forgot (1)**
38:6
**form (1)**
7:15
**forth (5)**
24:22;36:1;43:24,
25;46:1
**four (2)**
17:14;34:17
**frames (1)**
43:3
**fraud (1)**
25:10
**frequency (1)**
41:1
**frequent (2)**
21:9,11
**frequenting (1)**
40:15
**frequently (1)**
19:25
**friends (1)**
15:12
**front (11)**
26:18,21;27:13;
35:18;36:3;37:3;
38:25;40:5;41:12;
42:5;43:11
**full (1)**
7:24
**further (2)**
15:17;47:7

**G**

**gave (1)**
38:5
**generally (2)**
17:17;30:20
**gentleman (1)**
36:7
**Georgia (4)**
6:22;9:18,24;11:4
**girl (4)**
25:14;26:15;38:22;
45:16
**girls (17)**
18:22;19:7,10,17;
21:13;23:1,5,10,21;
25:5;26:9,12,20;
39:22,23;41:15;46:23
**given (1)**
8:2
**glitch (1)**
21:22
**good (3)**
14:24;24:16;34:6
**Google (1)**

D'Amico & Associates, Inc.
www.DamicoAssociates.com

31:7
**Gotcha (3)**
    9:14;38:12;45:4
**Grayson (3)**
    6:22;9:18,24
**great (1)**
    34:2
**ground (2)**
    17:23;30:25
**group (1)**
    25:5
**guys (3)**
    18:10;22:20,22

**H**

**hallways (1)**
    24:20
**hand (1)**
    11:20
**hanging (1)**
    22:23
**happen (2)**
    39:25;44:4
**happening (1)**
    32:4
**Harris (16)**
    6:6,21;7:3,8,24;8:1;
    15:10,11;16:12;
    29:20;34:6;46:16,17;
    47:3,9,24
**head (2)**
    9:10;10:17
**hear (9)**
    12:16,17;22:17;
    23:20;24:1,8,12;28:9;
    29:13
**heard (1)**
    38:2
**hearing (1)**
    25:4
**Hearsay (3)**
    23:23;24:9,14
**height (1)**
    36:12
**help (2)**
    14:9;35:11
**helped (1)**
    37:20;38:7,10
**hidden (1)**
    27:1
**Highway (2)**
    15:14;31:24
**hoes (2)**
    24:8,10
**homeless (4)**
    17:4,24;20:20;31:8
**Honestly (2)**
    14:17;27:16
**hotel (18)**
    12:22;15:4;19:6;
    24:19;29:1,13;30:3,7,
    25;34:7;38:9;40:21,

25;41:22;42:11,23,
    23;46:6
**hotels (5)**
    31:2;32:11;34:15,
    17;42:19
**hours (1)**
    18:15
**House (5)**
    37:22,24,25;38:5;
    45:1
**housekeepers (1)**
    27:22
**Hundredmark (2)**
    44:18,18
**hurt (1)**
    45:16

**I**

**idea (3)**
    33:15;36:8;37:14
**identification (2)**
    10:8;13:10
**identify (1)**
    6:10
**impression (1)**
    30:20
**incident (4)**
    13:18,22;14:5;
    16:18
**including (1)**
    7:10
**Incorporated (3)**
    6:7;7:12,13
**incorrect (1)**
    48:6
**Indiscernible (3)**
    26:14;29:10;40:10
**influence (1)**
    8:14
**Inn (14)**
    6:7;7:11,13;12:1,2;
    32:17,18,19,24,24;
    33:6;34:18,18
**inside (2)**
    44:5,5
**instead (1)**
    9:11
**interact (2)**
    39:8;41:6
**interacted (1)**
    43:13
**interacting (1)**
    23:5
**intersection (1)**
    30:21
**into (4)**
    15:23;21:20,24;
    26:15
**involved (1)**
    23:11

**J**

**joints (1)**
    22:24
**Jonathan (3)**
    6:13;7:5;44:17
**judge (1)**
    8:9
**jump (1)**
    48:16
**jury (1)**
    8:9
**juvenile (5)**
    14:6;15:9,11,18,21

**K**

**Kathy (5)**
    44:20,22;45:3,6,13
**Kathy's (1)**
    44:23
**keep (2)**
    35:18;36:1
**kept (1)**
    17:19
**kicked (2)**
    15:18;37:10
**kicking (2)**
    37:11,13
**kids (4)**
    20:11,16;21:3;38:5
**kind (13)**
    12:2;14:3;18:17;
    19:13,15;20:17;
    27:21;31:8,16;37:10;
    40:17,20,24
**knew (1)**
    28:15
**Knights (5)**
    12:1;32:17,18;33:6;
    34:18

**L**

**lady (2)**
    36:20;37:9
**Lane (1)**
    9:22
**language (1)**
    23:10
**last (7)**
    23:14;37:23;44:22,
    23;45:1,3,5
**later (1)**
    11:23
**Laura (1)**
    49:6
**law (1)**
    25:9
**Lawrenceville (1)**
    15:14
**lawsuit (1)**

46:5
**lawyers (1)**
    48:16
**Leading (1)**
    27:7
**least (1)**
    34:13
**leave (8)**
    17:1;20:10,24;22:2,
    5;34:1;37:18;44:13
**leaving (3)**
    38:4;42:14;43:25
**left (8)**
    12:3,3;14:5;15:15;
    16:13;31:12,12;42:22
**legal (1)**
    25:8
**length (1)**
    36:21
**less (2)**
    32:9,9
**level (1)**
    33:7
**limit (2)**
    49:5,6
**line (1)**
    15:2
**listed (2)**
    15:2,9
**little (6)**
    11:20;14:8;31:10,
    13;32:24;43:19
**live (1)**
    9:17
**lived (2)**
    42:1;46:23
**living (1)**
    10:1
**located (4)**
    6:22;11:3;14:6;
    15:13
**location (6)**
    15:15,16,19;16:13,
    14;40:16
**locations (1)**
    32:22
**loiter (1)**
    33:4
**loitering (1)**
    24:19
**long (11)**
    16:22,24;22:11;
    32:13,14;33:11;
    34:12;36:20;37:1;
    38:6;42:25
**longest (1)**
    34:19
**look (4)**
    13:20;19:9;21:15;
    33:17
**looked (5)**
    18:7;19:11,12,21;
    21:16

**looking (2)**
    12:24;27:24
**looks (1)**
    22:22
**losing (1)**
    15:1
**lot (10)**
    17:23;18:10;21:24;
    22:23;23:1;24:20;
    26:9;28:3;36:11;41:3
**Lyft (2)**
    20:22;43:6

**M**

**ma'am (3)**
    36:15;40:23;46:14
**makes (1)**
    28:22
**making (2)**
    25:17;38:2
**man (1)**
    16:1;22:3;27:5
**managers (1)**
    29:2
**many (2)**
    18:22,22
**Maps (1)**
    31:7
**March (1)**
    6:3
**Marissa (5)**
    6:16;7:14;9:5;
    33:25;34:7
**marked (3)**
    10:6,8;13:10
**Masters (6)**
    12:2;32:17,19,24,
    24;34:18
**matter (1)**
    6:6
**matters (1)**
    7:6
**may (6)**
    9:2,5;19:12;29:4;
    37:6;46:20
**maybe (12)**
    13:4,6;18:25;21:25;
    32:19;33:21,21;
    34:17;36:21;38:6,15,
    15
**mean (2)**
    20:9;22:21
**means (2)**
    48:1;49:9,16
**meant (1)**
    48:7
**medical (2)**
    10:2,4
**meet (1)**
    44:16
**members (3)**
    43:10,13,15

**men (9)**
    19:19;21:18;22:12,
    18;23:4,8,20;24:18;
    27:11
**mention (1)**
    35:19
**mentioned (2)**
    34:16;36:16
**Merrill (24)**
    6:16,16;7:17,20;
    13:17;20:3;22:14;
    23:23;24:9,14;25:19;
    27:7;28:5,9,11,17;
    34:2,5,7;47:1;50:13,
    14,18,19
**met (3)**
    7:4;44:18;46:12
**might (4)**
    9:5;23:5,9;24:19
**mom (1)**
    15:23
**moment (1)**
    29:19
**money (2)**
    42:16;46:9
**month (4)**
    33:20,21;34:13;
    38:15
**months (3)**
    33:15;38:14,17
**more (10)**
    15:1;21:9,11;26:8;
    32:9,24;33:20;36:23;
    44:14;47:6
**most (3)**
    18:25;22:1;28:6
**motel (38)**
    10:24;11:23;12:3,
    13,20,22;13:2;15:13,
    19;16:17;17:6,18,19;
    18:4,24;19:4;20:2,17;
    21:4,19,20;22:4,7,8;
    26:22;27:13;28:2,15;
    29:7;30:15,17;31:21;
    32:1,4,14;33:9;34:18,
    25
**mother (1)**
    15:18
**mothers (2)**
    39:11,14
**mouse (2)**
    11:20;31:16
**mouth (1)**
    22:24
**move (1)**
    42:23
**moved (3)**
    15:19;34:24;43:1
**movies (1)**
    25:4
**moving (2)**
    27:23;42:18
**much (7)**

    10:17;14:11;15:1;
    45:24;47:3;49:1,2
**multiple (1)**
    35:8;36:18;40:25
**Myself (2)**
    17:7;39:12

**N**

**name (12)**
    7:4,24;34:6;36:4,5,
    25;37:21;44:22,23;
    45:2,3;46:16
**names (5)**
    23:13,16;39:19;
    43:17;46:23
**narcotics (1)**
    8:15
**narrative (2)**
    14:21;16:10
**need (7)**
    7:17;9:20;42:5;
    49:21,21,24;50:9
**needed (1)**
    35:19
**newer (1)**
    19:24
**next (2)**
    23:3;31:1
**Nicholas (3)**
    37:22,23;38:5
**night (1)**
    21:9
**nobody (2)**
    27:23;33:4
**nod (1)**
    9:2
**nodding (1)**
    9:11
**Nods (2)**
    9:10;10:18
**Number (4)**
    7:12,13;10:7;13:9

**O**

**oath (1)**
    8:6
**object (2)**
    9:6,6
**objection (11)**
    6:14,17;20:3;22:14;
    23:23;24:9,14;25:19;
    27:7;28:11,17
**objections (2)**
    6:11;7:14
**obvious (1)**
    29:5
**occur (2)**
    41:12;44:8
**occurring (2)**
    29:11;42:12
**October (1)**

    9:16
**off (6)**
    20:21;22:6;27:5;
    47:20,21;50:6
**offered (1)**
    46:8
**office (3)**
    27:13,22,25
**officer (3)**
    14:22;15:3,8
**officers (1)**
    41:5
**often (1)**
    18:16
**old (2)**
    17:8;25:12
**older (4)**
    17:14;19:11,12;
    36:7
**once (2)**
    18:18;49:9
**one (17)**
    17:25;20:20,21;
    21:10,11;29:18;
    30:25;32:23;34:19,
    21;35:3,13;36:7,16;
    38:17;42:19;47:6
**ones (1)**
    33:5
**one-to-two-month (1)**
    39:3
**only (1)**
    36:11
**open (4)**
    27:1,3,21;44:8
**opinion (2)**
    28:22;39:4
**option (1)**
    48:4
**order (1)**
    50:8
**others (1)**
    21:11
**out (20)**
    15:18;18:9,13;
    20:10,24;21:16,25;
    22:7,8;23:12,16;
    26:25;27:2,25;37:10,
    11;44:2,8,20;49:23
**outside (3)**
    18:10;27:11;33:2
**over (6)**
    9:8;12:2;15:13;
    19:4,5;31:24
**overpass (1)**
    31:25

**P**

**P-1 (1)**
    10:7
**P-2 (1)**
    13:9

**Page (7)**
    11:9,9,12,15,18;
    14:20;30:9
**pages (1)**
    12:12
**pants (1)**
    22:23
**paranoid (1)**
    21:15
**parents (1)**
    15:12
**parking (3)**
    24:20;26:9;28:3
**part (3)**
    22:1;23:15;37:23
**particular (2)**
    19:3,6
**pass (1)**
    31:13
**pay (2)**
    35:7,8
**paying (1)**
    35:12
**PDF (1)**
    50:15
**people (18)**
    9:2;17:20;21:25;
    24:21;27:22;28:14;
    30:6;31:8;36:11,18;
    37:2,11,13;39:9;41:6,
    19;42:3,6
**period (4)**
    33:14;35:19;38:16;
    39:3
**periods (1)**
    39:16
**person (3)**
    20:1;25:9,11
**person's (1)**
    36:4
**phone (1)**
    45:2
**photograph (2)**
    10:21;12:7
**pick (2)**
    22:5;27:11
**picking (1)**
    26:9
**picture (7)**
    27:24;30:11,21;
    31:4,7;32:17;42:20
**pictures (2)**
    11:7;40:19
**pimp (1)**
    22:22
**pimps (5)**
    22:13,19,20;23:5,9;
    24:19
**place (6)**
    19:3,4,5;37:20;
    38:7;43:22
**plaintiffs (2)**
    6:14;7:5

**Plaintiffs' (3)**
    10:6;7;13:9
**please (2)**
    6:10,20
**pm (3)**
    6:4;47:19;50:20
**point (4)**
    20:20,21;42:17;
    43:5
**pointing (2)**
    31:14,16
**points (1)**
    42:21
**Police (12)**
    14:1;30:13;40:7,9,
    11,12,24;41:4,13,17,
    20;42:11
**ponytail (1)**
    36:21
**poor (1)**
    30:22
**pop (1)**
    40:13
**presumed (1)**
    49:13
**prevent (1)**
    8:15
**previously (1)**
    30:14
**probably (2)**
    24:16;36:21
**Procedure (1)**
    7:10
**process (1)**
    35:5
**program (2)**
    37:20,21
**properties (1)**
    40:12
**property (16)**
    19:2;29:2,8;33:5;
    35:20;39:1,22;40:10;
    41:5,23;42:1,2,12,15;
    43:16,23
**pull (1)**
    20:1
**purposes (1)**
    7:9
**put (3)**
    7:17;22:7,8

**R**

**races (1)**
    19:10
**ran (1)**
    15:6
**rating (2)**
    18:1;35:2
**reached (1)**
    44:20
**read (6)**
    14:23;47:25;48:4;

49:4,10;50:5

**really (6)**
17:20;27:16,23;
33:4;34:11;35:22

**recall (4)**
17:3;32:13;46:22;
47:10

**receipts (1)**
33:18

**recently (1)**
16:16

**recognize (3)**
10:20;12:6,14

**recollection (1)**
15:24

**record (10)**
6:2,4,11;7:18,25;
9:9;14:4;47:20,21;
50:6

**records (1)**
10:2

**referring (1)**
12:23

**refresh (1)**
15:24

**regarding (1)**
9:21

**Regular (2)**
50:11,15

**remember (37)**
13:3,5;14:17,19;
15:25;16:1,4,24;22:9;
30:5;33:11,16;34:12,
19,21;35:6,13;36:2,4,
5,23;37:6;38:16;
39:18;40:5,8;41:1;
42:25;43:2,10,12,15;
45:4,19,21,24;46:21

**remembered (1)**
45:17

**remembering (1)**
45:1

**remotely (4)**
6:8,12,18,23

**rental (1)**
35:5

**rented (1)**
15:10

**renting (1)**
35:18

**repeat (2)**
8:21;25:23

**rephrase (1)**
8:22

**report (7)**
13:18,22;14:13,15,
21;16:18;30:13

**reporter (13)**
6:20;8:25;24:1,6;
25:23;26:3;28:8,12;
29:18,24;47:22;49:8;
50:7

**represent (4)**

7:5;11:22;25:7;
34:7

**representation (3)**
11:3;12:10,20

**represented (1)**
46:2

**responded (2)**
15:4;27:24

**response (1)**
10:13

**responsiveness (1)**
7:16

**return (3)**
49:5,18,22

**review (4)**
14:25;48:10,14,19

**reviewed (1)**
50:1

**riding (1)**
41:5

**right (21)**
11:25;12:2;14:12;
16:5;31:12,13,17,19,
19,21;36:22,22;
38:19;39:3;44:5;
45:13;46:13;47:1,25;
48:12;49:17

**rim (1)**
19:23

**rocking (2)**
18:14,21

**Roger (1)**
46:16

**Room (14)**
15:6,11,16,21;
16:14;18:11,13;
26:21;33:3,3;35:5,9,
12,18

**rooms (6)**
18:10;21:20,24;
42:8;44:5;47:10

**rotate (1)**
32:11

**rotated (1)**
40:12

**roughly (2)**
16:22;18:22

**routine (1)**
20:18

**rude (1)**
17:20

**Rules (1)**
7:9

**run (1)**
20:11

**runaway (1)**
14:6

**rush (1)**
50:15

**S**

**Sadly (1)**

39:4

**same (8)**
13:20;15:17;20:13;
29:22;32:8,10,20;
45:23

**sand (1)**
31:17

**saved (1)**
45:2

**saw (19)**
18:23;19:7;21:13,
18;22:20,22;23:4;
25:14;26:8,25;27:23;
32:23;35:20;39:22;
41:6,11;43:21;45:9,
25

**saying (1)**
8:25

**scantily (2)**
19:15;41:16

**scene (1)**
10:20

**school (1)**
20:16

**scratch (1)**
18:2

**screen (3)**
13:12;16:21;17:1

**screen-share (1)**
10:11

**screen-sharing (1)**
13:15

**scroll (2)**
11:6;14:20

**security (1)**
30:3

**seeing (1)**
39:1

**selling (1)**
30:6

**send (3)**
48:1,2,3

**serve (1)**
9:20

**several (2)**
15:15;16:13

**sex (27)**
18:4,24;19:8;20:2;
21:8,14,19;23:6,11,
22;24:24;25:2,3,6,8,
10,15;26:25;27:12;
28:15;32:4,21;33:7;
41:12;43:22;45:12,14

**share (1)**
13:12

**sharing (1)**
13:15

**SHERRON (2)**
6:21;8:1

**short (2)**
36:9,10

**shoulder (1)**
36:22

**show (2)**
10:5;13:7

**showing (1)**
13:17

**shown (1)**
15:22

**shows (1)**
12:1

**side (3)**
19:6;27:25;36:1

**sign (9)**
47:25;48:9,11,14,
18;49:4,10,15;50:5

**signature (3)**
47:23;49:19,22

**signs (3)**
32:3,20,21

**similar (2)**
32:7;33:7

**sitting (1)**
46:22

**situation (4)**
35:15;45:7,10,15

**six (2)**
13:4;18:25

**sluts (1)**
24:12

**smell (2)**
40:14,15

**SMITH (2)**
6:21;8:1

**sold (1)**
25:5

**someone (4)**
25:17,20,25;28:2

**Sometime (1)**
45:5

**sometimes (7)**
8:19;18:10;20:10,
24,25;23:2;42:4

**somewhere (1)**
15:20

**son (2)**
15:6;38:21

**sorry (7)**
12:17;25:23;26:16,
17;27:15,20;28:24

**sound (2)**
16:5,15

**sounds (1)**
34:13

**speak (2)**
43:17;45:8

**speaking (1)**
43:10

**specifically (1)**
33:16

**Speculation (3)**
22:14;28:11,17

**spoken (2)**
44:19;46:17

**spot (1)**
31:13

**staff (8)**
35:21;38:25;40:5;
41:22;42:11;43:10,
12,15

**stand (2)**
18:9;33:2

**standing (4)**
26:12,20;27:11;
28:3

**start (1)**
36:22

**started (1)**
37:15

**state (2)**
6:11;7:24

**stated (1)**
15:17

**static (1)**
31:7

**stay (11)**
13:1;15:22;21:4;
32:16;37:16,20;38:6,
7;39:2;45:8,17

**stayed (14)**
11:1;15:13;16:22;
30:16;32:4,14,18;
33:19;34:16,19;37:9;
38:14,18;39:19

**staying (10)**
17:2,5,18;26:22;
33:12;35:2;37:15;
38:18;39:16;47:9

**still (1)**
29:5

**stop (7)**
20:11,12;21:3;
29:16;31:1,3;32:1

**stories (1)**
25:4

**storm (1)**
39:5

**stressed (1)**
21:15

**strict (1)**
32:25

**strip (1)**
32:12

**stuff (4)**
17:23;22:24;30:24;
45:25

**Styles (1)**
50:12

**Super (32)**
6:7;10:24;11:3,25;
12:14,23,23;13:1;
15:4;16:6,17,23;
22:13,19;30:17;
31:24;32:7,22;33:9,
12;34:12,17,25;35:5;
37:18;38:4,14,18;
42:23,24;46:24;47:10

**sure (5)**
25:14;27:23;31:8;

38:2;40:14
**surrounding (1)**
    17:22
**suspect (1)**
    15:10
**SW (1)**
    9:22
**swear (1)**
    6:20
**swell (1)**
    50:16
**switch (1)**
    16:20
**sworn (4)**
    6:12,15,18,23
**synched (2)**
    50:12,17

**T**

**talk (2)**
    9:8;45:6
**talked (2)**
    7:3;43:19
**talking (2)**
    18:23;29:21
**tall (1)**
    36:8
**taller (2)**
    36:11,12
**telephones (1)**
    47:11
**tendency (1)**
    9:1
**term (1)**
    39:23
**testified (1)**
    6:24
**testifying (1)**
    8:16
**testimony (2)**
    8:8;46:9
**Thanks (1)**
    10:16
**though (1)**
    38:24
**thought (13)**
    13:19;18:23;19:8;
    20:1;22:12,18,20;
    23:5,6,9,21;24:19;
    25:15
**threatened (1)**
    22:8
**three (1)**
    34:15
**Throughout (5)**
    20:4,6;21:12;29:1,9
**times (8)**
    9:5;20:10;21:1,2;
    22:23;37:4,5;40:25
**tint (1)**
    19:23
**tired (1)**

21:16
**today (9)**
    8:3;44:16;45:24;
    46:9,10,13,18,22;
    48:23
**together (1)**
    37:2
**toiletries (1)**
    42:3
**told (7)**
    25:20,25;37:7;
    45:19,22,23,24
**tomorrow (1)**
    48:24
**Tonge (42)**
    6:13,13;7:2,5,7,19,
    22,23;10:9;13:11,14,
    19,21;20:5;22:15;
    23:24;24:3,7,11,15;
    25:21;26:1,4;27:9;
    28:13,18;29:25;30:2;
    33:23;44:17,19;47:4,
    6,8,15,17,24;48:20;
    49:1,11;50:4,11
**Tonya (6)**
    6:6,21;7:8;8:1;
    15:10;16:12
**top (4)**
    12:2,3;14:1,5
**towards (2)**
    37:16,17
**towels (1)**
    42:3
**traffic (2)**
    37:13;45:25
**trafficking (6)**
    24:24;25:2,3,8;
    45:12,14
**transcript (2)**
    49:10;50:18
**trash (2)**
    17:23;30:24
**trees (1)**
    31:17
**trial (3)**
    7:10,20;9:21
**Trinity (1)**
    44:17
**truthful (1)**
    8:11
**truthfully (1)**
    8:16
**try (3)**
    9:7;10:10;14:25
**trying (1)**
    37:12
**Tucker (5)**
    6:7;7:11,13;11:4;
    30:15
**two (13)**
    7:6,11;17:7;20:21;
    32:22;33:21;37:2;
    38:6,14,15,17,19;43:9

**Type (1)**
    14:6

**U**

**Uber (2)**
    20:22;43:6
**under (5)**
    7:9;8:5,14;25:8,11
**unfair (1)**
    37:11
**Unintelligible (1)**
    28:5
**unknown (1)**
    15:19
**unless (5)**
    25:20,25;27:14,24;
    34:1
**up (19)**
    13:23;15:21,22;
    17:1;19:20;20:1;22:3,
    5;24:17;26:7,9,9;
    27:11,12;31:5;33:12;
    34:1;37:9;40:13
**Upon (1)**
    15:8
**use (3)**
    7:10;11:8;23:9
**used (3)**
    7:20;8:9;11:25
**using (1)**
    39:23

**V**

**vacationing (1)**
    17:25
**varied (1)**
    35:15
**vary (1)**
    35:14
**vehicle (1)**
    43:7
**Vehicles (2)**
    43:24;44:5
**verbalize (1)**
    10:16
**versus (1)**
    6:6
**via (2)**
    6:8;48:3
**video (6)**
    6:2,5;47:19,21;
    50:12,16
**videoconference (1)**
    6:9
**VIDEOGRAPHER (5)**
    6:3,19;47:18;50:13,
    17
**views (1)**
    12:13
**violent (1)**
    19:16

**W**

**wait (1)**
    9:3
**waive (2)**
    7:14;48:12
**walk (8)**
    14:3;18:11,13;
    21:25,25;30:25;
    41:16;43:16
**walked (3)**
    29:2;31:23,24
**walking (7)**
    20:11;24:21;29:8;
    30:25;41:23,25;42:2
**way (5)**
    25:13;27:15;29:3;
    30:23;31:25
**wearing (1)**
    19:14
**weed (1)**
    40:14
**week (3)**
    16:17;18:18;38:6
**weekly (2)**
    35:11;42:9
**weeks (2)**
    32:19;33:15
**weird (1)**
    29:25
**welcome (1)**
    47:5
**weren't (2)**
    17:24;21:2
**What's (4)**
    28:21;37:21,23;
    44:22
**Whenever (1)**
    35:1
**who's (1)**
    25:9
**within (2)**
    49:13,18
**without (1)**
    15:1
**witness (12)**
    6:12,14,17,20;18:3;
    29:23;40:9;47:5,16;
    48:18,21;50:3
**witnessed (1)**
    18:6
**woman (2)**
    15:5;25:14
**women (6)**
    18:9;22:5;25:5;
    27:10;43:24;46:23
**women's (2)**
    39:18;40:1
**wondering (2)**
    39:24;47:13
**words (2)**
    23:19;24:17

**work (3)**
    10:2;20:24;46:15
**worked (2)**
    28:3,14
**working (5)**
    20:15,22;21:1,2;
    43:6
**works (1)**
    10:11
**worn (1)**
    21:16
**wrote (2)**
    14:22;49:23
**Wyndham (1)**
    6:8

**Y**

**Y'all (2)**
    13:22;49:1
**year (3)**
    13:5;33:15;45:5
**years (5)**
    13:3,4;17:14;20:21;
    25:12
**yell (1)**
    23:10
**yelled (1)**
    23:12
**young (5)**
    16:1;37:9;39:11,14;
    45:15
**younger (1)**
    19:12

**Z**

**Zoom (5)**
    6:8;14:8;15:1;31:6;
    44:17
**zoom-out (3)**
    11:18;12:1;30:11

**1**

**1 (2)**
    10:6;11:9
**1:22-cv-02559 (1)**
    7:13
**1:22-cv-03419 (1)**
    7:12
**10 (1)**
    15:6
**11-ish (1)**
    17:11
**11-year-old (1)**
    38:21
**124 (1)**
    9:22
**13th (1)**
    9:16
**15 (1)**
    17:15

E.M./D.H. v.
Tucker Inn, et al

March 3, 2023

**15-year-old (1)**
  38:22
**1600 (1)**
  11:4
**16-year-old (1)**
  15:6
**18 (2)**
  17:10;25:11
**1977 (1)**
  9:16

## 2

**2 (2)**
  11:9;13:8
**2014 (5)**
  13:6;14:13;15:3;
  16:7;17:10
**2016 (1)**
  13:6
**2023 (1)**
  6:4
**24 (1)**
  18:15
**26th (2)**
  14:13;16:6
**2810 (1)**
  15:13

## 3

**3 (2)**
  11:12;14:20
**30 (6)**
  49:8,9,12,13,18,25
**30017 (1)**
  9:24
**3rd (1)**
  6:3

## 4

**4 (1)**
  11:15

## 5

**5 (3)**
  11:18;30:9;36:11
**5:29 (1)**
  6:4

## 6

**6 (12)**
  12:3;15:13,19;
  30:15,17;31:21;32:1,
  4,14;33:9;34:18,25
**6:10 (1)**
  47:19
**6:14 (1)**
  50:20

## 8

**8 (32)**
  6:7;10:24;11:3,25;
  12:14,23,23;13:1;
  15:4;16:6,17,23;
  22:13,19;30:17;
  31:24;32:7,22;33:9,
  12;34:12,17,25;35:5;
  37:18;38:4,14,18;
  42:23,24;46:24;47:10
**8/24/2014 (1)**
  15:22

D'Amico & Associates, Inc.
www.DamicoAssociates.com